761 A.2d 107 (2000)
335 N.J. Super. 103
Charles MOORE, Petitioner-Appellant,
v.
DEPARTMENT OF CORRECTIONS, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 16, 2000.
Decided November 13, 2000.
*108 Charles Moore, appellant, submitted a brief pro se.
John J. Farmer, Jr., Attorney General, attorney for respondent (Stephen D. Bird, Deputy Attorney General, on the brief).
Before Judges PETRELLA, NEWMAN and BRAITHWAITE.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Defendant Charles Moore was sentenced on August 15, 1997, to ten years in prison, five years without parole eligibility, for robbery. Moore is serving his sentence at Southern State Correctional Facility (SSCF) in Delmont, a prison operated by the Department of Corrections (DOC). After his minimum custody status was revoked by the Institutional Classification Committee (ICC) for failure to participate in a substance abuse program, Moore filed an appeal.
Moore challenges the reallocation of his minimum custody status on various grounds. He argues that (1) his rights were violated under the Americans with Disabilities Act (ADA) and the New Jersey Law Against Discrimination (LAD); (2) his due process rights were violated because he was denied a fair hearing; and (3) the ICC's determination was arbitrary and unreasonable.
The ICC of each correctional facility is responsible for, among other things, "[r]eviewing *109 the applications of inmates for changes in custody status." N.J.A.C. 10A:9-3.1(a)3.[1] The ICC is also responsible for "[m]onitoring the progress of inmates by scheduling periodic reviews to ensure that rehabilitative efforts are being maximized." N.J.A.C. 10A:9-3.1(a)2. The DOC's substance abuse treatment program is one of the rehabilitative efforts monitored by the ICC.
An inmate qualifies for a "therapeutic community program" if, among other things, the inmate has an "addiction severity index" (ASI) of five or above, in which case the inmate is "considered to be chronically addicted and in need of intensive substance abuse treatment." The ASI is "a clinical diagnostic and research instrument which rates an offender's addiction level."
Moore received an ASI score of seven and was assigned on November 10, 1998, to the Persons Incarcerated Entering Recovery (PIER) program, a therapeutic community at SSCF. On November 18, 1998, his custody level status was reduced from medium to full minimum custody. On November 20, 1998, Moore refused to begin treatment, contrary to the clinical staff's opinion that additional treatment was required. Moore claims that he withdrew from the PIER program after being examined by a prison psychologist, Dr. Frankel, whose psychological report opined that the PIER program was too stressful for Moore due to his HIV status. Moore also asserted that, as a result of his deteriorating health, he had to resume use of medication prescribed for stress.
An inmate who declines an assignment to a treatment program is not subject to disciplinary action, but shall "[n]ot be eligible for minimum custody or if already in gang or full minimum custody shall lose the custody status via the Objective Classification scoring instrument's `I' override." If the ICC determines that an inmate should be discharged from a therapeutic committee for an administrative reason (e.g., medical reasons), "it shall reassign the inmate pursuant to N.J.A.C. 10A:9-3.3, Classification Process,[2] without viewing the discharge in a negative light."
The ICC revoked Moore's full minimum custody status through an "I" override, due to his refusal to begin treatment, and reverted his custody status to medium. Moore sought leave to appeal out of time and we granted leave to file nunc pro *110 tunc. Moore filed a "notice of motion in lieu of subpoena for an in-camera inspection of confidential psychiatric records" of prison psychologist Dr. Frankel, arguing that he was denied the records for confidentiality reasons. The DOC asserted that the ICC never considered such a report because Moore's classification file did not contain such a report. We granted the DOC's cross-motion for a remand so Moore could be evaluated by a psychologist and the report considered by the ICC in determining his custody status.
On November 23, 1999, Dr. Frankel examined Moore and prepared a confidential psychological report in which he concluded that Moore "is not a good candidate for the PIER program at SSCF due to the emotional and stress factors that he is struggling with." The ICC reconsidered whether Moore's custody status was appropriately reverted to medium and issued a "K" override, concluding that Moore's custody status should remain medium based upon Dr. Frankel's report. Thereafter, the appeal was reactivated.

I.
Moore argues that his custody status was improperly reverted to medium despite his claimed adverse health effects or the fact that he is HIV positive. He contends his rights under the ADA (42 U.S.C.A. §§ 12101 to 12213) and LAD (N.J.S.A. 10:5-4 and 4.1) were violated. Included within the LAD definition of handicapped is "suffering from AIDS or HIV infection." N.J.S.A. 10:5-5q. The LAD claim is raised for the first time on appeal and, thus, is without merit. See N.J.S.A. 10:5-13.
Moore alleges he filed a written complaint with the ADA Coordinator within thirty days of the alleged violation (see N.J.A.C. 10A:1-3.3). Further, Moore asserts that the ADA received his complaint on December 17, 1998, although the record does not contain such letter or indication of receipt. Moore's appendix to his brief has a copy of an unsigned and unstamped letter. Assuming such a complaint was sent as asserted, there is no indication that Moore made any attempt to contact the ADA Coordinator within the two years since the ADA allegedly received it, to determine the status of the complaint. Moreover, there is no law which supports the proposition that the ADA applies or was intended to apply to custody status determinations. We decline to hold that the ADA applies to such determinations.

II.
Moore also argues that he did not receive a fair hearing because the ICC did not allow him to present exceptions or to argue that he did not "refuse treatment." Administrative due process is generally satisfied if "the parties had adequate notice, a chance to know opposing evidence, and the opportunity to present evidence and argument in response...." In re Dep't of Ins.'s Order Nos. A89-119 & A90-125, 129 N.J. 365, 382, 609 A.2d 1236 (1992). In Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that a change in a prisoner's conditions of confinement does not trigger the need for due process safeguards unless the change imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." We have followed Sandin in situations involving a change of custody status. Muhammad v. Balicki, 327 N.J.Super. 369, 372, 743 A.2d 376 (App.Div.2000). See also Blyther v. New Jersey Dep't of Corrections, 322 N.J.Super. 56, 730 A.2d 396 (App.Div.), certif. denied, 162 N.J. 196, 743 A.2d 848 (1999) (under Sandin, inmate does not have a liberty interest in remaining in general prison population nor does administrative assignment of gang leaders to the non-punitive Security Threat Group Management Unit program impose atypical and significant hardship on inmate in relation to ordinary incidents of prison life); Lorusso v. Pinchak, 305 N.J.Super. 117, *111 701 A.2d 974 (App.Div.1997) (there is no liberty interest in prison job assignments to support prisoner's claim of due process violation); White v. Fauver, 219 N.J.Super. 170, 530 A.2d 37 (App.Div.1987) (finding no constitutionally protected liberty interest in reduced custody status). "A reduction in custody status is a privilege and not a right." N.J.A.C. 10A:9-4.2.
In Muhammad, supra, 327 N.J.Super. at 371, 743 A.2d 376, the prisoner was placed on "reduced custody status," which we acknowledged "enables a prisoner to enjoy more mobility and less supervision in the prison than the general prison population." However, under an amendment of the regulation at issue, Muhammad did not receive reduced custody status in 1999. We observed that, "[w]hile the `atypical and significant hardship' standard of Sandin may be difficult to define [citation omitted], it is clear to us that the loss of enjoyment of greater mobility than that accorded to the general prison population [and] less supervision ... do not fall within that standard...." Id. at 372-373, 743 A.2d 376.
Here, the change in Moore's custody status did not trigger due process safeguards. The change did not impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Muhammad, supra, 327 N.J.Super. at 372, 743 A.2d 376. There is no constitutionally protected interest in reduced custody status.

III.
Moore also claims that the ICC arbitrarily decided to punish him for his inability to participate in the PIER program. It is well-established that an appellate court will not disturb the ultimate determination of an agency unless it was arbitrary, capricious or unreasonable or it was not supported by substantial credible evidence in the record as a whole. Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963). See also Brady v. Board of Review, 152 N.J. 197, 210, 704 A.2d 547 (1997) ("The judicial capacity to review administrative agency decisions is limited."). The test is essentially one of rational basis. Worthington v. Fauver, 88 N.J. 183, 204, 440 A.2d 1128 (1982).
There is substantial credible evidence in the record to support the ICC's decision to revert Moore's custody status to medium. See N.J.A.C. 10A:9-3.3(a) and N.J.A.C. 10A:9-4.5(a). Although Moore argues that the ICC's decision was unreasonable because his objective classification scoring result was a negative two, N.J.A.C. 10A:3-4.5(a) provides that the objective classification score is one of several different factors that the ICC "may" consider. The objective classification score is not, in and of itself, determinative of an inmate's custody status. Thus, in light of all the factors taken into consideration, the ICC's issuance of a "K" override was neither arbitrary nor unreasonable.
Affirmed.
NOTES
[1] There are six categories of custody status within the DOC, two of which are relevant for purposes of this appeal:

"Medium custody"inmates are assigned to "activities inside the security perimeter of the correctional facility under frequent and direct observation of staff." N.J.A.C. 10A:9-4.3(c).
"Full minimum custody"inmates are assigned to "[w]ork details, jobs or programs outside the main correctional facility, (on or off the grounds of the facility) with minimal supervision; and/or [a] satellite unit of minimum security trailer unit." N.J.A.C. 10A:9-4.3(e).
[2] The ICC's reassignment of the inmate's classification status is based upon a consideration of factors listed in N.J.A.C. 10A:3-3.3(a):

1. The objective classification scoring results as indicated on form CRAU-006 or CRAU-007 (excluding inmates committed to A.D.T.C.);
2. Needs and interests expressed by inmate;
3. Age;
4. Family status;
5. Social contacts with family and friends;
6. Correctional facility adjustment;
7. Educational history and needs;
8. Vocational history and needs;
9. Military history;
10. Nature and circumstance of present offense;
11. Prior offense record;
12. Records from previous confinement;
13. Detainers on file or pending;
14. Drug dependency and/or involvement;
15. Sexual adjustment;
16. History of escape, attempted escape or propensity for escape;
17. Current psychological and/or psychiatric reports;
18. Medical history and recommendation;
19. Arson history;
20. Needs of the correctional facility; and/or
21. Any other factor pertinent to the inmate's case.