894 A.2d 698

CRAIG SZEMPLE, APPELLANT, v. DEPARTMENT
OF CORRECTIONS, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted December 6, 2005—Decided March 29, 2006.

---

[6] We add for the parties' assistance on the remand that we find no merit in the City's arguments objecting to the Board's back pay award.

246

Before Judges KESTIN, HOENS and R.B. COLEMAN.

*Craig Szemple,* appellant pro se.

*Peter C. Harvey,* Attorney General, attorney for respondent Department of Corrections (*Michael J. Haas,* Assistant Attorney General, of counsel; *Christopher C. Josephson,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

R.B. COLEMAN, J.A.D.

Appellant Craig Szemple appeals from a Final Agency Decision of the Department of Corrections (DOC) designating him a "high risk" inmate. Appellant argues he has a protected liberty interest affected by such a designation and that he is entitled to a hearing. We reject those arguments and affirm.

Appellant is serving three consecutive life sentences at New Jersey State Prison in Trenton, having been convicted of two counts of murder and one count of aggravated manslaughter. He was also convicted of three counts of theft by deception. Although appellant denies any involvement, he is suspected of having made plans with five other inmates to escape from the prison. According to the DOC, the suspected escape plan was averted and never implemented. Apart from denying any involvement in any escape plan, appellant asserts that the plan is alleged to have been thwarted in late 1997 and early 1998. As such, it is too remote to be an appropriate basis for the current classification.

The DOC acknowledges that appellant is designated a "high risk" inmate, but it contends that such designation is not a custody status.[1] The DOC contends the only consequence of the designation of appellant as a "high risk" inmate is that additional security is required when appellant is transported outside the prison.

---

[1] Pursuant to *N.J.A.C.* 10A:9–4.1, "[t]here are six categories of custody status within the New Jersey Department of Corrections: (1) Close custody; (2) Maximum custody; (3) Medium custody; (4) Gang minimum custody; (5) Full minimum custody; and (6) Community custody." *See also N.J.A.C.* 10A:9–4.3 (describing the assignments of inmates in the various custody levels).

Appellant contends, however, that he also has been prohibited from working in a yard gang position, in the prison shops, in the cook house area, or as a gym porter. For purposes of this appeal, we accept as true appellant's contention that he is subject to such location restrictions.

At the outset, we note that the scope of judicial review of an administrative agency's factfinding is limited. *Brady v. Bd. of Review,* 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997); *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). An appellate court is not to decide the case as a "court of first instance" would. *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (quoting *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)). This court is only to determine whether the findings made by the agency could reasonably have been reached on sufficient credible evidence present in the record. *Ibid.*

Although certain rights and interests of prisoners in State correctional institutions have been recognized, our Supreme Court has "generally declined to recognize a liberty interest warranting due-process protection where the prisoner's status was subject to change by authorities without any proof of misconduct." *Jenkins v. Fauver,* 108 *N.J.* 239, 248, 528 *A.*2d 563 (1987) (citing *Meachum v. Fano,* 427 *U.S.* 215, 96 *S.Ct.* 2532, 49 *L.Ed.*2d 451 (1976)). In *Jenkins,* the Court upheld the relocation of all inmates with prior homicide convictions from the Rahway Camp, a satellite minimum-heightened security correctional facility to the main prison, where they were reclassified either "full minimum—inside only," which was not a classification recognized by departmental standards, or "gang minimum," a classification permitting inmates housed in the main prison to be assigned to activities or jobs on institutional grounds outside of the main facility, but within the supervisory control of corrections officials. *Id.* at 256, 528 *A.*2d 563. The DOC's action in *Jenkins* was precipitated by the escape of two inmates from the Rahway Camp, and the Court concluded that the Legislature had "vested in the Commissioner broad discretionary powers to administer the Department" and "to take appropriate

action to preserve satisfactory relationships with municipalities affected by the proximity of state penal institutions." *Id.* at 252, 528 *A.*2d 563. Under the circumstances presented in *Jenkins,* the Court observed that no "useful purpose [would] have been served by an expansive hearing since the only issue to be resolved was whether the particular inmate's record reflected a conviction for homicide." *Id.* at 254, 528 *A.*2d 563.

In this case, appellant contends his status was affected by an unfounded suspicion that he had been a participant in an escape plan and he argues he is entitled to a due process hearing before his liberty interest can be affected. We disagree. Courts of this State have consistently held that the due process clause of the United States Constitution does not give prisoners a liberty interest in remaining free from transfer to more restricted facilities. *See, e.g., Jenkins, supra,* 108 *N.J.* at 249, 528 *A.*2d 563; *Smith v. New Jersey Dep't of Corrections,* 346 *N.J.Super.* 24, 29, 786 *A.*2d 165 (App.Div.2001); *Moore v. Dep't of Corrections,* 335 *N.J.Super.* 103, 109, 761 *A.*2d 107 (App.Div.2000); *Blyther v. New Jersey Dep't of Corrections,* 322 *N.J.Super.* 56, 60, 730 *A.*2d 396 (App.Div.1999); *Lorusso v. Pinchak,* 305 *N.J.Super.* 117, 118, 701 *A.*2d 974 (1997).

In those cases, we have repeatedly expressed our adherence to the United States Supreme Court holding in *Sandin v. Conner,* 515 *U.S.* 472, 484, 115 *S.Ct.* 2293, 132 *L.Ed.*2d 418 (1995). In *Sandin,* the Court determined that a change in a prisoner's conditions of confinement does not trigger the need for due process safeguards unless the change imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293. In *Muhammad v. Balicki,* 327 *N.J.Super.* 369, 372–73, 743 *A.*2d 376 (App.Div.2000), we observed that "[w]hile the 'atypical and significant hardship' standard of *Sandin* may be difficult to define, it is clear to us that the loss of enjoyment of greater mobility than that accorded to the general prison population, less supervision and eligibility for more

good-time credits do not fall within that standard[.]" (internal citation omitted).

In his brief on appeal, appellant relies on *Wilkinson v. Austin,* 545 *U.S.* 209, 125 *S.Ct.* 2384, 162 *L.Ed.*2d 174 (2005), to support his argument that he has a protected liberty interest in not being classified as a "high risk" inmate, with the resulting increase in security and other restrictions on his movement. Based on that asserted liberty interest, appellant contends that he is entitled to a hearing prior to any determination classifying him as a "high risk" inmate. Appellant's reliance on *Wilkinson* is misplaced.

*Wilkinson* considered whether an inmate had a liberty interest in avoiding assignment to Ohio's "Supermax" facility, the Ohio State Penitentiary (OSP). *Id.* at ——, 125 *S.Ct.* at 2388, 162 *L.Ed.*2d at 184. The United States Supreme Court described the unique conditions at OSP as follows:

> Supermax facilities are maximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general prison population.... Conditions at OSP are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units.... In the OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.
>
> Incarceration at OSP is synonymous with extreme isolation.... All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact....
>
> Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP.
>
> [*Id.* at ——, 125 *S.Ct.* at 2388–89, 162 *L.Ed.*2d at 184–85.]

Such extreme conditions led the Court to conclude that "assignment to OSP imposed an atypical and sufficient hardship under any plausible baseline." *Id.* at ——, 125 *S.Ct.* at 2394, 162 *L.Ed.*2d at 190. Thus, the usual baseline recognized at least ten years earlier in the Court's opinion in *Sandin, supra,* 515 *U.S.* at 484, 115 *S.Ct.* at 2300, 132 *L.Ed.*2d at 430 (1995), had been transcended.

The conditions that pertain to inmates at OSP are not fairly comparable to appellant's designation and the accompanying restrictions. Indeed, the *Wilkinson* Court itself recognized that the Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement, *Id.* at ——, 125 *S.Ct.* at 2393, 162 *L.Ed.*2d at 189, (citing *Meachum, supra,* 427 *U.S.* at 225, 96 *S.Ct.* at 2538, 49 *L.Ed.*2d at 459).

Appellant's "high risk" designation merely subjects him to increased security in the form of additional prison guards in attendance when he is escorted from the prison. That heightened scrutiny is not "atypical and significant" and does not require that appellant be afforded a hearing as to its propriety. The DOC's suspicion that appellant was participating in a plot to escape from prison with five other inmates was based on information from a confidential source. It was not unreasonable for prison officials to take steps to prevent an escape and to subject the suspected participants to certain precautionary restrictions and heightened supervision. We perceive no abuse of discretion and no denial of due process.

Affirmed.